Filed 5/11/15 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CALIFORNIA BUILDING INDUSTRY ASSOCIATION,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>STATE WATER RESOURCES CONTROL BOARD,<br><br>     Defendant and Respondent. | A137680<br><br>(San Francisco City and County<br>Super. Ct. No. CGC-11-516510)<br><br>**ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br>NO CHANGE IN JUDGMENT** |

**BY THE COURT:**

It is ordered that the published opinion, filed on April 20, 2015, be modified as follows:

1.     Page 2, bottom paragraph, fourth line: Porter-Cologne Water Quality Act should be Porter-Cologne Water Quality Control Act.

2.     Page 14, second paragraph, first and fourth lines: section 13620 should be section 13260.

3.     Page 15, last paragraph, fourth line: section 3260 should be section 13260.

4.     Page 16, first full paragraph, fourth line is deleted and replaced with: Section 13260 provides that some stormwater dischargers, those subject to a general industrial or construction stormwater permit under the national pollutant discharge elimination system (NPDES), must be separately accounted for in the Fund and requires some of those funds to be spent within the same region where those dischargers are located "to carry out stormwater programs in the region." (§ 13260, subds. (d)(2)(B)(i), (d)(2)(B)(ii).)

5.     Page 16, first full paragraph, sixth line is deleted and replaced with: This provision requires special treatment of fees and funds for some storm water dischargers

but there is no suggestion that the Board must balance the fee for the storm water program with the revenue from that program.[8] (See § 13260, subds. (d)(2)(B)(i)-(iii).)

6. Page 16, delete the last sentence in footnote 8: The complaint does not allege that CBIA or its members are participants in NPDES.

7. Page 20, first sentence of footnote 10: "retrospective" should be "retroactive."

8. Water discharger or water discharge should be replaced with waste discharger or waste discharge, respectively, in the following instances:

     a. Page 2, subheading before bottom paragraph: "The Permit Fees for Water Dischargers" should be "The Permit Fees for Waste Dischargers."

     b. Page 14, second paragraph, fifth line: "water dischargers" should be "waste dischargers."

     c. Page 14, bottom paragraph, first line: "report of water discharge" should be "report of waste discharge."

     d. Page 16, first full paragraph, first and second lines: "discharge water program" should be "waste discharge program."

     e. Page 18, second full paragraph, third line: "water discharge" should be "waste discharge."

     f. Page 18, second full paragraph, fifth line: "water dischargers" should be "waste dischargers."

     g. Page 20, first paragraph, fifth line: "water discharge" should be "waste discharge."

     h. Page 20, footnote 11, third line: "water discharge" should be "waste discharge."

9. Dissenting opinion at page 2, footnote 2: "the Board's defective motion for reconsideration" should be "the Association's defective motion for reconsideration"

The petition for rehearing, filed on May 5, 2015, is denied. Richman, J. would grant the petition for rehearing.

There is no change in judgment.

Dated: _____

Kline, P.J.

Trial Court:                                    San Francisco County Superior Court

Trial Judge:                                    Hon. Curtis E. A. Karnow

Attorneys for Plaintiff and Appellant:          Rutan & Tucker, LLP
                                                David P. Lanferman

Attorneys for Defendant and Respondent:         Kamala D. Harris
                                                Attorney General of California
                                                Paul D. Gifford
                                                Robert W. Byrne
                                                Senior Assistant Attorneys General
                                                Gavin G. McGabe
                                                Molly K. Mosley
                                                Supervising Deputy Attorneys General
                                                Robert E. Asperger
                                                Tiffany Yee
                                                Deputy Attorneys General

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| CALIFORNIA BUILDING INDUSTRY ASSOCIATION,<br><br>      Plaintiff and Appellant,<br><br>      v.<br><br>STATE WATER RESOURCES CONTROL BOARD,<br><br>      Defendant and Respondent. | A137680<br><br><br>(San Francisco City and County Super. Ct. No. CGC-11-516510) |


When parties discharge waste that could affect the quality of California's water they must pay an annual permit fee set by the State Water Resources Control Board (the Board).  (See Wat. Code, § 13260.)[1]  In 2011, two of the five seats of the Board were vacant; two of the remaining three Board members voted to approve an increase of fees for the 2011-2012 fiscal year.  The California Building Industry Association (CBIA) asserts that section 183 required the fees to be approved by a majority of the five-person Board.  CBIA also contends that the Board violated section 13260 and imposed an illegal tax because the fee imposed on the dischargers in the storm water program—one of eight program areas in the waste discharge permit program—exceeded the cost of regulating this particular program.

The Board responds that a majority of the Board's quorum voted to approve the fee in compliance with section 181, the applicable statute.  The charge was a valid regulatory fee under section 13260, according to the Board, because the total fees collected for all eight programs did not exceed the total cost to regulate the entire waste

---

[1]  All further unspecified code sections refer to the Water Code.

1

discharge permit program.  The Board maintains that CBIA incorrectly interprets the law to impose a requirement that the fees charged to storm water dischargers must correspond exactly to the costs of regulating that one program.

We conclude that section 181, not section 183, applies to the Board's adoption of the fee schedule and that the Board's action complied with section 181.  We also reject CBIA's principal argument that the fees and regulating expenses for one particular program must be equal; we hold that section 13260 requires that the total fees collected from all waste dischargers must equal the costs of regulating the entire waste discharge permit program.

CBIA bears the burden of making a prima facie case showing the fee was invalid. (See *California Farm Bureau Federation v. State Water Resources Control Bd.* (2011) 51 Cal.4th 421, 436 (*Farm Bureau*).)  Courts have held that a regulatory fee is valid as long as the charges do not surpass the costs of regulating the program and the allocation of the fees to the payor is fair and reasonable.  (See, e.g., *Sinclair Paint Co. v. State Bd. of Equalization* (1997) 15 Cal.4th 866, 878 (*Sinclair Paint*); *San Diego Gas & Electric Co. v. San Diego County Air Pollution Control Dist.* (1988) 203 Cal.App.3d 1132, 1146; *Beaumont Investors v. Beaumont-Cherry Valley Water Dist.* (1985) 165 Cal.App.3d 227, 235.)  Here, CBIA did not make a prima facie case that the charges surpassed the costs of regulating the program or that allocation of the fees was unfair or unreasonable. Accordingly, we affirm the judgment.

## BACKGROUND

### *The Permit Fees for Water Dischargers*

The Board**,** a state agency within the California Environmental Protection Agency**,** regulates water rights and water quality.  (§§ 175, 179.)  In 1969, the Legislature added to the Water Code, Assembly Bill No. 413 (Stats. 1969, ch. 482), which included the Porter-Cologne Water Quality Act (the Act), a statewide program for water quality control. (§ 13000 et seq.)  Under this Act, nine regional boards, overseen by the Board, administer the state program in their respective regions.  (§§ 13140, 13200 et seq., 13240, 13301.)

2

The Act vests the Board with authority to formulate and adopt state policy for water quality control. (§ 13140.)

Parties who discharge waste or propose to discharge waste "that could affect the quality of the waters of the state" are required by the Act to file a "report of waste discharge" (i.e., a permit application) with the Board. (§ 13260, subds. (a)-(c).) Each party filing a permit application under the Act must pay an annual fee according to a fee schedule established by the Board. (§ 13260, subd. (d)(1)(A).) The fees collected are deposited in the Waste Discharge Permit Fund (the Fund), and "[t]he money in the [F]und is available for expenditure by" the Board "upon appropriation by the Legislature solely for the purposes of carrying out this division." (*Id.,* subd. (d)(2)(A).) "The total amount of annual fees collected . . . shall equal that amount necessary to recover costs incurred in connection with the issuance, administration, reviewing, monitoring, and enforcement of waste discharge requirements and waivers of waste discharge requirements." (*Id.,* subd. (d)(1)(B).)

The Board must annually adopt a water quality fee schedule by emergency regulation to establish the amount of fees each discharger must pay that year. (§ 13260, subd. (f)(1).) "The total revenue collected each year through annual fees shall be set at an amount equal to the revenue levels set forth in the Budget Act for this activity. The state board shall automatically adjust the annual fees each fiscal year to conform with the revenue levels set forth in the Budget Act for this activity. If the state board determines that the revenue collected during the preceding year was greater than, or less than, the revenue levels set forth in the Budget Act, the state board may further adjust the annual fees to compensate for the over and under collection of revenue." (*Ibid.*)

***The Schedule of Fees for the 2011-2012 Fiscal Year***

For the 2011-2012 fiscal year, the annual Budget Act provided for $100,672,000 in spending from the Fund for the waste discharge permit program, but the projected revenue based on the existing fee schedule was $73,070,000. The Board staff calculated that it would have to increase the fees to compensate for a $27.6 million dollar shortfall, and proposed significant fee increases in the eight program areas within the waste

3

discharge program, including the storm water program area.[2] With regard to the storm water program, the Board had collected substantially more revenues than it reported as "expenditures" for each of the seven fiscal years prior to the fiscal year 2011-2012. The net surplus over the seven years since fiscal year 2004-2005 was $23,506,000.

The Board's staff proposed a 34.9 percent increase in fees for all storm water dischargers to generate fee revenue to equal the storm water program area's budget of $26,619,000 for fiscal year 2011-2012. The Board scheduled a public hearing for September 19, 2011, for the consideration of new "emergency regulations" related to the proposed schedule of fees for fiscal year 2011-2012.

The Board currently consists of five members. (§ 175, subd. (a).) At the time of the hearing on September 19, 2011, two seats on the Board were vacant. The remaining three Board members conducting the hearing considered the opposition to the fee increase presented by CBIA and others. The Board adopted Resolution 2011-0042, which approved the proposed new schedule of fees. The new fee schedule increased the storm water program fees by 34.9 percent; the total fee increase for all eight programs cumulatively averaged 37.8 percent. Two of the three Board members voted for the resolution, while the third abstained.

On September 22, 2011, the Board submitted the emergency regulation adopted at the Board meeting on September 19, 2011, to the Office of Administrative Law for approval. The emergency regulations were filed with the Secretary of State, and published in the California Code of Regulations.

---

[2] The Board asserts that these are eight program areas but acknowledges that its own staff often refers to them as programs, not program areas. The Board claims that "[a]ll eight program areas are merely different components of the same regulatory activity."

Without providing significant detail or description, the Board identifies the following eight program areas: the storm water program, the national pollutant discharge elimination system program, the waste discharge requirements program, the land disposal with a "tipping" fee, the land disposal without a "tipping" fee, the 401 certification program, the confined animal facilities program, and the irrigated lands regulatory program.

*Court Proceedings*

On December 9, 2011, CBIA filed a petition for writ of mandate and a complaint for declaratory and injunctive relief. CBIA is a nonprofit corporation with 3000 members who are "active in all aspects of the home-building industry throughout California." CBIA and its members "are required to seek waste discharge and storm water discharge permits from the Board[.]"

CBIA claimed the storm water fees were higher than the amount permitted under section 13260 and were not a valid regulatory fee. Additionally, it claimed that section 183 requires a majority vote by all members of the Board to adopt a fee schedule, which did not occur; therefore the fee, according to CBIA, was invalid.

The trial court held a hearing on September 20, 2012, and later that day issued an order denying the writ petition. CBIA filed a motion for reconsideration, which was heard on October 25, 2012. The court denied this motion and filed its judgment in favor of the Board.

CBIA filed a timely notice of appeal. After filing their briefs, and at our request, the parties provided supplemental briefing on the applicability of sections 181 and 183.

## DISCUSSION

### I. *The Number of Board Members Necessary for Approval of the Fee*

As noted, in September 2011, when the Board adopted the fee schedule for fiscal year 2011-2012, two Board seats were vacant. Of the three remaining Board members conducting the hearing in September 2011, two voted to approve the fee schedule; the third member abstained.

CBIA contends that under the plain language of section 183, a majority of the Board members—three—had to approve the fee schedule, and the approval by two Board members was not procedurally valid. The Board responds that section 181, not section 183, applies to the Board's action and the fee was validly approved pursuant to section 181 because two of the three Board members, a majority of the quorum, voted to adopt the fee schedule.

5

**A.** *Standard of Review*

Interpreting statutes is a question of law subject to de novo review. (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 311.) " '[A]s in any case of statutory interpretation, our task is to determine afresh the intent of the Legislature by construing in context the language of the statute.' [Citation.] In determining such intent, we begin with the language of the statute itself. [Citation.] That is, we look first to the words the Legislature used, giving them their usual and ordinary meaning. [Citation.] 'If there is no ambiguity in the language of the statute, "then the Legislature is presumed to have meant what it said, and the plain meaning of the language governs." ' [Citation.] 'But when the statutory language is ambiguous, "the court may examine the context in which the language appears, adopting the construction that best harmonizes the statute internally and with related statutes." ' [Citation.] [¶] In construing a statute, we must also consider ' "the object to be achieved and the evil to be prevented by the legislation." ' [Citation.]" (*People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 192-193.) We " 'avoid a construction that would produce absurd consequences, which we presume the Legislature did not intend.' " (*In re Greg F.* (2012) 55 Cal.4th 393, 406.)

**B.** *The Plain Language of Section 181 and 183*

Section 181, consistent with the common-law rule, provides that "[t]hree members of the board shall constitute a quorum for the purpose of transacting any business of the board." (See Civ. Code, § 12 ["Words giving a joint authority to three or more public officers or other persons are construed as giving such authority to a majority of them, unless it is otherwise expressed in the Act giving the authority"]; Code Civ. Proc., § 15 [same].) "The almost universally accepted common-law rule . . . is, in the absence of a contrary statutory provision, a majority of a quorum constituted of a simple majority of a collective body is empowered to act for the body. Where the enabling statute is silent on the question, the body is justified in adhering to that common-law rule." (*F.T.C. v. Flotill Products, Inc.* (1967) 389 U.S. 179, 183-184, fn. omitted; see also *McCracken v. City of San Francisco* (1860) 16 Cal. 591, 602.) Here, three Board members were present at the

meeting and a majority of the quorum approved the fee schedule. Under section 181 and the common law, the Board's approval of the fee schedule was procedurally valid.

CBIA claims that section 183 creates an exception to the common law rule set forth in section 181. According to CBIA, the plain language in the second paragraph of section 183 requires a majority of the Board, which is three members, to approve any final action of the Board.

Section 183 reads: "The board may hold any hearings and conduct any investigations in any part of the state necessary to carry out the powers vested in it, and for such purposes has the powers conferred upon heads of departments of the state by Article 2 (commencing with Section 11180), Chapter 2, Part 1, Division 3, Title 2 of the Government Code. [¶] Any hearing or investigation by the board may be conducted by any member upon authorization of the board, and he shall have the powers granted to the board by this section, but any final action of the board shall be taken by a majority of all the members of the board, at a meeting duly called and held. [¶] All hearings held by the board or by any member thereof shall be open and public." (§ 183, fn. omitted.)

We begin with the presumption that, in the absence of an express provision, statutes do not alter the common law and should be construed to avoid conflict with common law rules. (*Saala v. McFarland* (1965) 63 Cal.2d 124, 130, fn. omitted; see also *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804, 815.) Accordingly, " '[r]epeal by implication is recognized only where there is no rational basis for harmonizing two potentially conflicting laws.' [Citation.]" (*California Assn. of Health Facilities v. Department of Health Services* (1997) 16 Cal.4th 284, 297.)

The middle paragraph of section 183 authorizes a single member of the Board to conduct a hearing or investigation, but specifies that no final action can be taken at that hearing. The first part of the sentence permits hearings and investigations to be "conducted by any member upon authorization of" the Board, and the second part of the same sentence specifies "*but* any final action of the board shall be taken by a majority of all the members of the board, at a meeting duly called and held." (§ 183, italics added.) The word "but" is a conjunction and is "used to express a difference or to introduce an

7

added statement." (<Http://dictionary.cambridge.org/us/dictionary/american-english/but>.) The use of the word "but" plainly ties the requirement of taking any final action by a majority to the first phrase, which refers to a hearing conducted by one Board member. Furthermore, the end of the sentence specifies that the final action will be taken by a majority of Board members "at a meeting duly called and held" (§ 183); no subsequent meeting would need to be called except in a situation where fewer than a quorum participated in the first hearing or meeting.

Focusing on the word "any," CBIA asserts that the "plain meaning" of section 183 is that "any final action" of the Board must be taken by a majority of the members of the Board. They insist that " '[t]he word "any" is not ambiguous[.]' " (See *People v. Dunbar* (2012) 209 Cal.App.4th 114, 117-118 [statute targets the forgery of " '*any* book of records[,]' " and the use of the word " 'any' " indicated that it applied to public or private records, not just public records]; see also *Department of California Highway Patrol v. Superior Court* (2008) 158 Cal.App.4th 726, 736 [use of "the word 'any' . . . in a statute unambiguously reflects a legislative intent for that statute to have a broad application"].)

We agree that, standing alone, the word "any" is unambiguous. However, CBIA has not construed this word, as it must, in the context in which it appears. (See *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735.) We interpret "any," as we interpret all the words of the statute, in context, harmonizing to the extent possible all provisions relating to the same subject matter. (*County of Alameda v. Pacific Gas & Electric Co.* (1997) 51 Cal.App.4th 1691, 1698.) "[T]he word 'any' means without limit and no matter what kind." (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 798.) The plain meaning of this word in context is that all final actions following a hearing or investigation by one Board member must be "taken by a majority of all the members of the board" at another duly called meeting. (§ 183.) This construction is consistent with a broad rather than narrow application of the word "any" (see, e.g., *Utility Cost Management v. Indian Wells Valley Water Dist.* (2001) 26 Cal.4th 1185, 1191 ["[t]he use of the word 'any' and the inclusion of several disjunctives to link essentially synonymous words all serve to

8

broaden the applicability of the provision"]), as no particular action or subset of actions following the hearing or investigation of a single Board member is exempt from the requirement that final action can only be "taken by a majority of all the members of the board, at a meeting duly called and held." (§ 183.) The Legislature by using the word "any" clearly intended to prevent the Board from ever being able to delegate final decision-making authority to one Board member.

Furthermore, our interpretation of section 183 is consistent with section 175. Subdivision (b) of section 175 states that members of the Board "shall, to the extent possible, be composed of members from different regions of the state" and subdivision (a) provides that the members must represent diverse specialties: "One of the members appointed shall be an attorney admitted to practice law in this state who is qualified in the fields of water supply and water rights, one shall be a registered civil engineer under the laws of this state who is qualified in the fields of water supply and water rights, one shall be a registered professional engineer under the laws of this state who is experienced in sanitary engineering and who is qualified in the field of water quality, and one shall be qualified in the field of water quality. One of the above-appointed persons, in addition to having the specified qualifications, shall be qualified in the field of water supply and water quality relating to irrigated agriculture. One member shall not be required to have specialized experience." (§ 175, subd. (a).) Section 175 indicates that the Legislature appreciated that the hearings and investigations before the Board requires specialized knowledge and thus under section 183 the Legislature permits the Board to delegate the responsibility of a hearing or an investigation to a Board member with the requisite specialization. However, the expertise of that Board member does not enable him or her to make any final decision; any final action pursuant to this section requires a *subsequent hearing* and *must* "be taken by a majority of all the members of the board . . . ." (§ 183.)

The interpretation urged by CBIA and Justice Richman creates an unnecessary conflict between sections 181 and 183. These statutes can clearly be harmonized, as the express language of section 183 indicates that it applies *only* to situations in which the Board has delegated authority to one member to conduct a hearing or meeting.

9

Accordingly, because a quorum participated in the hearing pertinent to this case, section 183 does not apply.

## C. *Legislative History*

Because we believe the plain language of section 183 makes clear that it does not apply to all final decisions, we do not need the aid of legislative history to determine the statute's true meaning. (See *People v. Gonzalez* (2014) 60 Cal.4th 533, 537-538.) We consider the legislative history only because CBIA and Justice Richman rely so heavily upon it.[3]

CBIA reads the legislative history as indicating that section 183 applies to all final actions of the Board. Sections 181 and 183, which were formerly sections 191 and 193, respectively, were enacted in 1956. At that time, the Board was comprised of three members. Former section 191 provided: "The board shall maintain its headquarters at Sacramento and shall hold meetings at such times and at such places as shall be determined by it. The Governor shall designate the time and place for the first meeting of the board. All meetings of the board shall be open and public." (Stats. 1956, 1st Ex. Sess., ch. 52, § 7.) Former section 193 stated: "The board may hold hearings and conduct any investigations in any part of the State necessary to carry out the powers vested in it, and for such purposes as the powers conferred upon heads of departments of the State by Article 2 . . . . [¶] Any hearing or investigation by the board may be conducted by any member of the board upon authorization of the board, and he shall have

---

[3] Justice Richman criticizes us for analyzing the "naked language of the two statutes," while he avoids any substantial examination of the text of section 183. (Dis. opn. of Richman, J., p. 1.) As is often said, the words of the statute "are the most reliable indicator of legislative intent." (*People v. Lopez* (2003) 31 Cal.4th 1051, 1056.) He also states that he is "puzzled" by our "invocation of the principle that statutes in derogation of the common law are to be strictly construed." (See dis. opn., p. 11, fn. 8.) This is a clear misreading of our opinion. Section 183, unlike other statutes that expressly conflict with the common law rule (see, e.g., Gov. Code, § 25005), does not alter the common law quorum rule set forth in section 181. Had the Legislature intended the interpretation advocated by the dissent it would have said so clearly in section 183. (See Civ. Code, § 12; Code Civ. Proc., § 15.)

10

the powers granted to the board by this section, but any final action of the board shall be taken by the board as a whole. [¶] All hearings held by the board or by any member thereof shall be open and public." (Stats. 1956, 1st Ex. Sess., ch. 52, § 7.)

In 1957, sections 191 and 193 were renumbered as sections 181 and 183 (Stats. 1957, ch. 1932), and section 181 was amended to add the following as the final sentence: "Two members of the board shall constitute a quorum for the purpose of transacting any business of the board."[4] (Stats. 1957, ch. 947, § 4.) Section 183 was amended to change "any final action of the board shall be taken by the board as a whole" to "any final action of the board shall be taken by a majority of members of the board at a meeting duly called and held." (Stats. 1957, ch. 1824, § 2.)

On June 14, 1957, Office of Legislative Counsel provided a "Report on Senate Bill No. 2199," stating in pertinent part the following: "Section 181 of the code, as amended by Chapter 947 (A.B. 2970) of this session, provides that two members of the board shall constitute a quorum for the purpose of transacting any business of the board. This bill would make it clear that the same number of members may take any final action of the board."[5] Sections 181 and 183 have developed parallel to each other and the Board's interpretation of the statutes, consistent with the Office of Legislative Counsel's statement, reflects that the Legislature never intended for section 183 to supplant section 181. Rather, the Board's long-established interpretation of section 181 has been that it generally applies to "any final action" of the Board. When an administrative agency has consistently interpreted statutory language over time, its long-standing analysis is entitled to greater deference. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 13.)

---

[4] In 1967, when the size of the Board was increased to five members, section 181 was amended to state that three members of the Board constitute a quorum.

[5] At oral argument, CBIA claimed, without citing any authority, that section 183 concerns "quasi-legislative, rule-making" decisions and section 181 applies solely to business decisions. This argument is inconsistent with the Legislative Counsel's comment and the plain language of section 183.

11

In 1969, Assembly Bill No. 412 amended the second paragraph of section 183 by adding the word "all" so that section 183 required that "any final action of the board shall be taken by a majority of all the members of the board at a meeting duly called and held[.]" (Stats. 1969, ch. 482, § 2.) CBIA and Justice Richman rely heavily on a letter dated July 29, 1969, from Senator Gordon Cologne, Chair of the Senate Water Resources Committee, regarding this bill. This letter, printed in the Senate Journal, quotes the report from the Committee on Water Resources, and specifies that the following comments in the report are to "be utilized to assist in the determination of legislative intent" in approving Assembly Bill No. 412. Under the heading of "Section 183," the report provides: "The present law is ambiguous as to whether final action by the state board always requires a majority consisting of three members of the five-man state board, or whether the majority required is only that of the 'members of the board (present) at a meeting duly called and held.' In the latter case three members could constitute a quorum, and the vote of two members would constitute a majority of the members at the meeting. An amendment has been made to this section to remove the ambiguity by requiring that final board action shall always require the concurrence of a majority of all the members of the board, not merely a majority of a quorum."

CBIA and Justice Richman attribute far more significance to Senator Cologne's letter quoting the report from the Committee on Water Resources than it warrants.[6]

---

[6] CBIA also cites *Marina County Water Dist. v. State Water Resources Control Bd.* (1984) 163 Cal.App.3d 132. In *Marina County Water Dist.*, the Court of Appeal did not interpret section 183. The appellate court, when setting forth the background facts, noted that the superior court had declared a Board order void "because it was not approved by a majority, i.e., three members, of the Board as required by . . . section 183." It pointed out that the Board "[s]ubsequently issued a second order . . . exactly the same as the first, but approved by the requisite majority. (*Marina County Water Dist.,* at p. 136.) It is unclear from this opinion whether one member or a quorum participated in the first vote. Moreover, the court did not consider the correct interpretation of section 181 or section 183. Accordingly, *Marina County Water Dist.* does not provide any authority for the proper construction of section 183. (See, e.g., *Silverbrand v. County of Los Angeles* (2009) 46 Cal.4th 106, 127 [cases are not authority for issues they did not consider or decide].)

12

According to our colleague, Senator Cologne's letter "is virtually conclusive proof that the Legislature expressly intended that section 183 [require] that 'final board action shall *always* require a concurrence of a majority of *all the members* of the board, *not merely a quorum.*' " (Dis. opn., p. 1, Justice Richman's italics.) That is clearly not the case. CBIA and Justice Richman misread the letter quoting the report. As the "comment" states, the ambiguity to be eliminated was "whether final action by the state board always requires a majority consisting of three members of the five-man state board, or whether the majority is only that of the 'members of the board (present) at a meeting duly called and held.' " The amendment was needed to make clear "that final board action shall always require the concurrence of a majority of all the members of the board, not merely a majority of a quorum." The "final action" mentioned in the report referred solely to the portion of section 183 concerned with a hearing or investigation *conducted by a single member*. The amendment simply clarified that section 183 requires a majority vote of the Board with respect to final action on any matter heard or investigated by a single member of the Board. It is telling that Senator Cologne's letter and the report never mention section 181; his silence demonstrates the absence of any intention to do away with the general rule set forth in section 181 that "[t]hree members of the board shall constitute a quorum for the purpose of transacting any business of the board."

CBIA's and Justice Richman's expansive reading of section 183 ignores the principle that common law rules can be statutorily altered only expressly, not by implication. (*Saala v. McFarland, supra*, 63 Cal.2d 124, 130; *California Assn. of Health Facilities v. Department of Health Services, supra*, 16 Cal.4th 284, 297; *County of Sonoma v. Superior Court* (2009) 173 Cal.App.4th 322, 345-346 & fn. 11 [court explained that Government Code section 25005 expressly modifies the common law rule because this statute provides, " '[*n*]*o act of the board* shall be valid or binding *unless a majority of all members concur therein*' "].) If the purpose of section 183 was to overrule section 181, as CBIA and Justice Richman insist, the Legislature would certainly have done so explicitly. It did not.

13

For the foregoing reasons, we conclude that section 181 applies to the Board's adoption of the fee schedule and the Board complied with this statute when three Board members attended the hearing on the fee schedule for the 2011-2012 fiscal year and two of the three voted to adopt the fee schedule.[7]

## II. *Compliance with Section 13260*

CBIA contends that the Board violated section 13620 by collecting fees beyond the sum needed to regulate the storm water program. The Board acknowledges that the fees for storm water dischargers exceeded the actual expenditures for that program but claims CBIA's interpretation of the requirements under section 13620 is incorrect. The statute, according to the Board, obligates it to collect fees from all the water dischargers equal to the total expense of regulating the entire waste discharge permit program and it does not need to balance the fees for one program by that one program's costs. The trial court agreed with the Board's interpretation of the statute and we review its ruling de novo. (See, e.g., *In re Tobacco II Cases, supra,* 46 Cal.4th at p. 311.)

When specifying who must file a report of water discharge, section 13260, subdivision (a), does not refer to the storm water program or any of the other seven program areas. Rather, it provides that the following persons must file a report of discharge with the appropriate regional board: "(1) A person discharging waste, or proposing to discharge waste, within any region that could affect the quality of the waters of the state, other than into a community sewer system. [¶] (2) A person who is a citizen, domiciliary, or political agency or entity of this state discharging waste, or proposing to discharge waste, outside the boundaries of the state in a manner that could affect the quality of the waters of the state within any region. [¶] (3) A person

---

[7] The Board argues that an independent reason for rejecting CBIA's argument is that section 183 requires a majority of the Board members (three) to participate in the final action, and does not require a majority to vote in the affirmative. Because the Board hearing at issue was not conducted by a single member and section 183 does not apply, we have no need to decide whether section 183 expressly modifies the common law rule for final actions taken on matters heard or investigated by a single member pursuant to section 183.

14

operating, or proposing to construct, an injection well." (§ 13260, subd. (a).)

Each party applying for a permit must pay an annual fee specified by a schedule established by the Board. (§ 13260, subd. (d)(1)(A).) The references to the fees and costs are not to a specific program but relate to "the total" amount of fees or all recoverable costs. Thus, subdivision (d)(1)(B) of section 13260 states: "*The total amount of annual fees collected* pursuant to this section shall equal that amount necessary *to recover costs* incurred in connection with the issuance, administration, reviewing, monitoring, and enforcement of *waste discharge requirements* and waivers of waste discharge requirements." (Italics added.) Except as noted below, the statute does not tie any recoverable costs to a particular program: "Recoverable costs may include, but are not limited to, costs incurred in reviewing waste discharge reports, prescribing terms of waste discharge requirements and monitoring requirements, enforcing and evaluating compliance with waste discharge requirements and waiver requirements, conducting surface water and groundwater monitoring and modeling, analyzing laboratory samples, adopting, reviewing, and revising water quality control plans and state policies for water quality control, and reviewing documents prepared for the purpose of regulating the discharge of waste, and administrative costs incurred in connection with carrying out these actions." (§ 13260, subd. (d)(1)(C).)

Section 13260, subdivision (d)(1)(B) refers to the "total amount of annual fees collected" and the total fees must equal "[t]he total amount . . . necessary to recover" the Board's costs relating to all waste discharge requirements. Similarly, subdivision (f)(1) of section 3260 refers to all fees or the "total" fees imposed under section 13260, not to fees associated with a particular program. Section 13260, subdivision (f)(1) requires the Board to adopt a water quality fee schedule by emergency regulation each year to establish the amount of fees each discharger must pay. (§ 13260, subd. (f)(1).) "The *total revenue collected* each year through annual fees shall be set at an amount equal to the revenue levels set forth in the Budget Act for this activity. The state board shall automatically adjust the annual fees each fiscal year to conform with the revenue levels set forth in the Budget Act for this activity. If the state board determines that the revenue

15

collected during the preceding year was greater than, or less than, the revenue levels set forth in the Budget Act, the state board may further adjust the annual fees to compensate for the over and under collection of revenue." (*Ibid.*, italics added.)

Section 13260 repeatedly refers to the total costs and expenses of the discharge water program. None of the language in section 13260 indicates that the fees and expenses are to be correlated for each of the eight program areas within the current waste discharge program. The Legislature's failure to mention the storm water program while discussing the Board's obligation to balance the fees by its regulating costs cannot be deemed an oversight because the Legislature does specifically name the storm water program elsewhere in section 13260. Section 13260 provides that some stormwater dischargers, those subject to the national pollutant discharge elimination system (NPDES), must be separately accounted for in the Fund and requires some of those funds to be spent within the same region where those dischargers are located "to carry out stormwater programs in the region." (§ 13260, subds. (d)(2)(B)(i), (d)(2)(B)(ii).) Some of those funds must also be spent "on stormwater inspection and regulatory compliance issues associated with industrial and construction stormwater programs." (§ 13260, subd. (d)(2)(B)(iii).) This provision requires special treatment of fees and funds for storm water dischargers subject to NPDES but there is no suggestion that the Board must balance the fee for the storm water program with the revenue from that program.[8] (See § 13260, subds. (d)(2)(B)(i)-(iii).)

CBIA contends that reference in section 13260 to multiple fees confirms that the statute requires the Board to establish a schedule of fees for each program. CBIA also maintains that the record establishes that the Board's claim of one fee is a fiction, as the Board has created eight separate budgets and calculated eight separate fees for each program.

---

[8] Neither the Board nor CBIA explains the reasons for these requirements, although the Board declares, "The reasons for these requirements are not stated in section 13260 and are not relevant here." The complaint does not allege that CBIA or its members are participants in NPDES.

16

The reference to multiple fees in section 13260, subdivision (f)(1), simply indicates that the total fee is to be comprised of the various fees. Indeed, the Board acknowledges that it sets different fees for each program area prior to calculating the total fee. As just explained, the statute does not mandate that the fee for each program area must correspond to the costs of that particular program. "Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history." (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562.) Furthermore, section 13260 states that the fees shall be adjusted to conform "with the revenue levels set forth in the Budget Act" and this revenue consists of a single appropriation from the Fund to help support the entire waste discharge permit program.

Finally, the legislative history of section 13260 does not support CBIA's construction of section 13260. In 1969, this statute provided that any person discharging waste or proposing to discharge waste was to file a report "accompanied by a filing fee not to exceed one thousand dollars ($1,000) according to a reasonable fee schedule established by the state board." (Former § 13260, subd. (d).) The amount of the maximum fee was increased to $10,000 in 1989, and the "[f]ees [were to] be calculated on the basis of total flow, volume, number of animals, or area involved." (Former § 13260, subd. (d).) No program is mentioned in the original statute or in its amendment in 1989.

Subdivision (f)(1), which also refers to the "total revenue collected," was added to section 13260 and enacted in 1989. In 2003, section 13260 was amended to specify that each person filing a report of waste discharge must "submit an annual fee according to a fee schedule established by the state board" and "the total amount of annual fees" are to "equal that amount necessary to recover costs incurred in connection" with regulating the entire waste discharge program. (§ 13260, subds. (d)(1)(A) & (B).) Indeed, the Legislature amended section 13260 repeatedly through 2011, but none of the amendments required the fee for a particular program to equal the cost for regulating that program. To the contrary, the language connecting the schedule of fees to the "total

17

revenue" remained intact. " 'The failure of the Legislature to change the law in a particular respect when the subject is generally before it and changes in other respects are made is indicative of an intent to leave the law as it stands in the aspects not amended.' [Citations.]" (*Estate of McDill* (1975) 14 Cal.3d 831, 837-838.)

Accordingly, we affirm the trial court's construction of section 13260, which did not require the Board to correlate the fees for a particular program with the costs for that program.

### III. *Valid Regulatory Fee or Invalid Tax?*

### A. *The Difference Between a Fee and a Tax*

CBIA contends that the fee charged to the storm water dischargers was not a legal regulatory fee, but an invalid tax.**9** The Board's authority under section 13260 is limited to collecting revenue reasonably equal to the costs for regulating the water discharge permit program; thus, it does not have broad legislative authority under this statute to impose a tax on water dischargers. (See, e.g., *Abbott Laboratories v. Franchise Tax Bd.* (2009) 175 Cal.App.4th 1346, 1360.)

The term " ' "tax" has no fixed meaning [and] the distinction between taxes and fees is frequently "blurred," taking on different meanings in different contexts.' " (*Farm Bureau, supra,* 51 Cal.4th at p. 437.) Regulatory fees are imposed under the state's police power rather than its taxing power, and must bear a reasonable relationship to the

---

**9** CBIA argues that the Board's fee is an unconstitutional tax but it does not cite any constitutional provision. It relies on cases applying Proposition 13, which became part of the California Constitution and the original provision required a two-thirds vote of the Legislature to impose "any changes in state taxes enacted for the purpose of increasing revenues." (Former Cal. Const., art. XIII A, § 3.) However, Proposition 26 modified Proposition 13, effective November 2, 2010. The current provision in the California Constitution restricts "[a]ny change in state statute which results in any taxpayer paying a higher tax . . . ." (Cal. Const., art. XIII A, § 3.) The Board's fee schedule is not a "change in state statute," and this constitutional provision does not apply. (See *Western States Petroleum Assn. v. Board of Equalization* (2013) 57 Cal.4th 401, 423-424.) Rather than a constitutional challenge to the fee, CBIA's argument is essentially that, under the case law applying the original language of Proposition 13, the Board's imposition is not a valid regulatory fee, but an illegal tax.

fee payor's burdens on or benefits from the regulatory activity. (*Sinclair Paint, supra,* 15 Cal.4th at pp. 874-878.) In contrast, a tax may be imposed upon a class that may enjoy no direct benefit from its expenditure and is not directly responsible for the condition to be remedied. (*Leslie's Pool Mart, Inc. v. Department of Food & Agriculture* (1990) 223 Cal.App.3d 1524, 1543; see also *Schmeer v. County of Los Angeles* (2013) 213 Cal.App.4th 1310, 1326 [generally, "tax" "refers to a compulsory payment made to the government or remitted to the government"].)

**B.** ***The Test for Determining Whether the Charge is a Fee or a Tax***

Whether the Board's imposition is a tax or a fee is a question of law decided upon an independent review of the record. (*Farm Bureau, supra,* 51 Cal.4th at p. 436 .) "The plaintiff challenging a fee bears the burden of proof to establish a prima facie case showing that the fee is invalid. [Citations.] In other words, the plaintiff bears the burden of proof 'with respect to all facts essential to its claim for relief.' [Citations.] The plaintiff 'must present evidence sufficient to establish in the mind of the trier of fact or the court a requisite degree of belief (commonly proof by a preponderance of the evidence)." (*Ibid.,* fn. omitted.)

"[O]nce plaintiffs have made their prima facie case, the state bears the burden of production and must show ' "(1) the estimated costs of the service or regulatory activity, and (2) the basis for determining the manner in which the costs are apportioned, so that charges allocated to a payor bear a fair or reasonable relationship to the payor's burdens on or benefits from the regulatory activity." ' [Citations.]" (*Farm Bureau, supra,* 51 Cal.4th at pp. 436-437; quoting *Sinclair Paint, supra,* 15 Cal.4th at p. 878; see also *Beaumont Investors v. Beaumont-Cherry Valley Water Dist., supra,* 165 Cal.App.3d at p. 235.) Flexibility in establishing the amount of regulatory fees is important (*California Assn. of Prof. Scientists v. Department of Fish & Game* (2000) 79 Cal.App.4th 935, 950 (*Prof. Scientists*)), but "[a]n excessive fee that is used to generate general revenue becomes a tax" (*Farm Bureau,* at pp. 436-437).

## C. *The Reasonableness of the Fee*

With regard to CBIA's burden of producing prima facie evidence that the fee was unreasonable, the trial court stated that CBIA made "no showing" that the fees were unreasonable.[10]  In the trial court and on appeal, CBIA focuses on the discrepancy between the costs and fees for the storm water program.  As discussed *ante,* the reasonableness of the fees relates to the costs of regulating the entire water discharge program.  Moreover, the reasonableness of the fee is not measured by the impact on an individual payor; "[t]he question of proportionality is not measured on an individual basis.  Rather, it is measured collectively, considering all rate payors." (*Farm Bureau, supra,* 51 Cal.4th at p. 438.)  "Thus, permissible fees must be related to the overall cost of the governmental regulation.  They need not be finely calibrated to the precise benefit each individual fee payor might derive." (*Ibid.*; see also *Collier v. City and County of San Francisco* (2007) 151 Cal.App.4th 1326, 1353 [court held it was reasonable to transfer building permit fee revenues from the department of building inspection to the planning and fire departments to cover actual costs incurred in performing regulatory activities related to the building permit process].)  " 'Legislators "need only apply sound judgment and consider 'probabilities according to the best honest viewpoint of informed officials' in determining the amount of the regulatory fee." [Citation.]' [Citation.]" (*Farm Bureau,* at p. 438.)

The trial court correctly found that CBIA failed to make a prima facie case that the fee was unreasonable.[11]  CBIA did argue that the fees were too high because the Board

_____

[10]  The trial court also rejected CBIA's claim that the fees violated its due process rights based on their being retrospective.  On appeal, CBIA does not argue that the fees are illegally retroactive and we may disregard issues not addressed in the briefs; we may treat them as having been abandoned or waived.  (See *Reyes v. Kosha* (1998) 65 Cal.App.4th 451, 466, fn. 6.)  Accordingly, we do not consider the legality of retroactive fees.

[11]  In its reply brief, CBIA does attack the evidence presented by the Board, but it does not cite evidence it presented in the trial court that showed the total fees charged by the Board surpassed the estimated costs for regulating the entire water discharge program.

20

anticipated a $27 million increase in program expenditures for fiscal year 2011-2012 but did not increase program activities that year.[12] The Board responded that the permit program lost much of its general fund subsidy, and the Board had to increase all fees, including the stormwater discharge fee, to cover the program's costs as established in the Budget Act. Thus, fees were increased to maintain adequate revenue in the Fund even though total spending for the waste discharge permit program remained the same.

Although the burden of production never shifted to the Board, it did produce evidence regarding the reasonableness of the total fee. For fiscal year 2011-2012, the Board's fee schedule was based upon anticipated revenue of $101.2 million, including $100.7 million in fee revenue and $602,000 in other revenue. Those anticipated revenues closely corresponded to the projected expenditures of $101.4 million from the Fund. Moreover, the fees collected were deposited in the Fund and that money could be used "solely for the purposes of" the waste discharge permit program. (§ 13260, subd. (d)(2)(A).)

Accordingly, the trial court properly rejected CBIA's contention that the amount of fees anticipated to be collected surpassed the cost of the regulatory services or programs they were designed to support.

## D. *The Reasonableness of the Cost Allocations*

The trial court did not consider the second prong of the test for assessing whether the imposition is a fee or a tax, which is whether the Board's method of assessing the challenged fees among the payors was reasonable or fair " ' "so that charges allocated to

---

[12] To the extent CBIA is arguing that the Board's projections were based on expenditures, rather than costs, we reject this argument. Section 13260 refers to both costs and expenditures. Subdivision (d)(1)(B) states that the annual fees "shall equal that amount necessary to recover costs" of regulating the program. (§ 13260, subd. (d)(1)(B).) Subdivision (d)(2)(A) provides that the fees are to be deposited in the Fund and that money "is available for expenditure by the state board . . . ." (§ 13260, subd. (d)(2)(A).) CBIA does not present evidence that the Board made any improper expenditures and it was not unreasonable for the Board to estimate the costs based on expected expenditures. (See *Farm Bureau, supra,* 51 Cal.4th at p. 438.)

a payor bear a fair or reasonable relationship to the payor's burdens on or benefits from the regulatory activity." ' " (*Farm Bureau, supra,* 51 Cal.4th at pp. 436-437.)

The Board claims that CBIA did not contend in the trial court or on appeal that the fee was unreasonably allocated. CBIA vigorously disputes this assertion and stresses that its principal objection to the fee was that storm water dischargers were paying an unreasonably high fee given that the Board had collected substantially more revenue than it reported as "expenditures" for the storm water program for each of the seven fiscal years prior to the fiscal year 2011-2012 for a net surplus of $23,506,000. CBIA might not have used the word allocation in its opening brief or in the trial court, but its argument that the storm water dischargers were paying an unfair fee is essentially an unfair allocation argument.

As the court in *Prof. Scientists, supra,* 79 Cal.App.4th 935 pointed out, most courts considering whether a charge is a fee or a tax have considered the reasonableness of the fee and not "[t]he more difficult issue . . . [of] what latitude [the state agency] has in establishing the amount of a fee imposed on an individual payor." (*Id.* at p. 946; see *Sinclair Paint, supra,* 15 Cal.4th at pp. 872, 881 [paint manufacturers were assessed fees in proportion to their share of the market and plaintiffs would have opportunity at trial to show "that the amount of the fees bore no reasonable relationship to the social or economic 'burdens' its operations generated"].) The court in *Prof. Scientists* reviewed the few decisions that considered this latter issue and concluded: "While the formula or rate structure may not have been exact, each bore some relationship to the benefit reaped or the burden imposed by the payor. Put another way, the payors had some control over the amount of the regulatory fee they were compelled to pay by the degree to which their respective activities impacted the environment. The more they polluted the air and consumed the water, the more they paid." (*Prof. Scientists,* at pp. 949-950, citing *Pennell v. City of San Jose* (1986) 42 Cal.3d 365, 375 [upheld a rent control ordinance, which imposed a flat annual fee on each rental unit, as a regulatory fee, because fee was "designed to defray the costs of providing and administering the hearing process prescribed in the ordinance, not to pay general revenue to the local government"]; *San*

22

*Diego Gas & Electric Co. v. San Diego County Air Pollution Control Dist., supra,* 203 Cal.App.3d at p. 1136 [fee to support air pollution control district was reasonable as it was apportioned to be based in part on the amount of emissions on premises]; *Brydon v. East Bay Mun. Utility Dist.* (1994) 24 Cal.App.4th 178, 196-204 [new rate structure increasing the price of water was not arbitrary or capricious].)

With regard to the challenged fee in *Prof. Scientists, supra,* 79 Cal.App.4th 935, the court concluded that a flat filing fee imposed by the Department of Fish and Game to help defray some of its costs in meeting its environmental review obligations was a regulatory fee, not a tax. The court held "that a regulatory fee, to survive as a fee, does not require a precise cost-fee ratio. A regulatory fee is enacted for purposes broader than the privilege to use a service or to obtain a permit. Rather, the regulatory program is for the protection of the health and safety of the public. The legislative body charged with enacting laws pursuant to the police power retains the discretion to apportion the costs of regulatory programs in a variety of reasonable financing schemes." (*Prof. Scientists*, at p. 950.)

We decline to consider whether the Board met its burden of production because we conclude that CBIA failed to make a prima facie case. CBIA did not offer evidence that the Board's allocation of the fee based on expected expenditures for the 2011-2012 fiscal year was unfair or unreasonable. Although the burden of production therefore never shifted, the Board nevertheless submitted evidence that the fee imposed on storm water dischargers did bear a reasonable relationship to the burdens of regulating that program. The storm water program area's budget for the fiscal year of 2011-2012 was $26.6 million and projected revenue was $19.7 million. The Board's action in increasing the fee for storm water dischargers by 34.9 percent was not unreasonable as this increase generated the $6.9 million difference between the budget and projected revenue for the storm water program. Furthermore, the fee increase for the storm water program was slightly *less* than the average increase for all of the programs, which was 37.8 percent.

CBIA presented evidence that the Board had collected substantially more revenue than it reported as "expenditures" for the storm water program for each of the seven fiscal

23

years prior to the fiscal year 2011-2012 for a net surplus of $23,506,000. CBIA's argument is essentially that the fee was unfair because the Board should have compensated storm water dischargers in 2011-2012 for the overpayment in earlier years. It maintains that the Board had no reasonable reason for refusing to do this and cites the Board's statement that it considered limiting the increase in fees for storm water dischargers but decided not to compensate them for the prior years of surplus, primarily because it concluded that those who contributed to the surplus were probably not the same people who would benefit. CBIA claims that the Board provided no evidence to support this latter conclusion.

The Board did not need to provide evidence unless CBIA met its burden of making a prima facie case, which it failed to do. CBIA did not present evidence that the Board unfairly deviated from its usual method when calculating the fee for the storm water program; nor did it submit evidence that the Board had limited increases in fees for any of the other seven programs to offset their surpluses in prior years. Subdivision (f)(1) of section 13260 states that the Board "may further adjust the annual fees to compensate for the over and under collection of revenue." There is no requirement that it must do so and thus CBIA had to provide evidence that the Board's failure to do so when setting the 2011-2012 fees was unreasonable or unfair.

Additionally, CBIA proffered no evidence that the Board's method unfairly caused the surplus revenue in earlier years. Again, although the burden of production never shifted, the Board offered evidence that its method did not cause the surplus. The inaccurate projections for the storm water program were due to this program's revenue being generated by the economically volatile construction industry.

CBIA argues that we should remand to the trial court to provide it with an opportunity to make factual findings. (See *Farm Bureau, supra,* 51 Cal.4th at p. 442.) We decline to do so because CBIA failed as a matter of law to meet its burden of making a prima facie case that the fee was an illegal tax.

## DISPOSITION

We affirm the judgment. CBIA is to pay the costs of appeal.

24

_____
Kline, P. J.

I Concur:


_____
Brick, J.*


*California Building Industry Association v. State Water Resources Control Board*
(A137680)


      * Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


25

Trial Court:                                   San Francisco County Superior Court

Trial Judge:                                   Hon. Curtis E. A. Karnow

Attorneys for Plaintiff and Appellant:         Rutan & Tucker, LLP
                                               David P. Lanferman

Attorneys for Defendant and Respondent:        Kamala D. Harris
                                               Attorney General of California
                                               Paul D. Gifford
                                               Robert W. Byrne
                                               Senior Assistant Attorneys General
                                               Gavin G. McGabe
                                               Molly K. Mosley
                                               Supervising Deputy Attorneys General
                                               Robert E. Asperger
                                               Tiffany Yee
                                               Deputy Attorneys General

A137680, *California Building Industry Association v. State Water Resources Control Board et al.*

Dissenting opinion of Richman, J.

A rule of the common law, codified in a number of California statutes, is that a quorum of the full membership of a decisionmaking entity may transact business, and a majority of that quorum may enact, pass, or approve any measure entrusted to that entity. The question presented here is whether the common law rule, codified as Water Code section 181 (section 181) and applicable to the five members of the State Water Resources Control Board (Board), overrides another statute, Water Code section 183 (section 183), which commands that "any final action of the board shall be taken by a majority of all the members of the board." [1] The majority concludes that section 181 states the general rule, to which the differing rule of section 183 constitutes an exception not applicable here.

If all we had to work with was the naked language of the two statutes, I might agree with the majority. But we are not required to hazard an answer based on such a slim basis. The majority-of-a-quorum common law rule has, from the earliest days of the state, always been recognized as subject to statutory modification requiring a specified or absolute majority to take certain action. An unusual item of legislative history from the 1969 amending of section 183 constitutes what I think is virtually conclusive proof that the Legislature expressly intended that section 183 be such a statute, one requiring that "final board action shall *always* require a concurrence of a majority of *all the members* of the board, *not merely a majority of a quorum*." (Italics added.) Thus, when the Board considers whether to vote yea or nay on a proposed final action, it is section 183, not section 181, that states the general rule, thus requiring at least three affirmative or negative votes.

Here, the Board purported to take a very significant "final action"—adopting a resolution setting the fees charged for administering a number of regulatory programs under the Porter-Cologne Water Quality Control Act (see § 13260, subds. (d), (f)(1); Cal.

---

[1] Statutory references are to the Water Code unless otherwise indicated.

1

Code Regs., tit. 23, §§ 2200-2200.7)—with the affirmative votes of only two of the Board's statutory membership of five. Two is not a majority of five. I conclude that the Board's purported adoption of the resolution is therefore void, and consequently should be set aside. Having failed to persuade my colleagues to adopt this approach, I respectfully dissent from their conclusion that the two-vote passage of the resolution was proper and valid.

## The Problem

The Board consists of five members. (§ 175, subd. (a).) The resolution challenged here was adopted when the Board had only three members, there being two vacancies. Two of the three members voted for the resolution, while the third abstained. The current disagreement is about section 183, which in its entirety provides:

"The board may hold any hearings and conduct any investigation in any part of the state necessary to carry out the powers vested in it, and for such purposes has the powers conferred upon heads of departments of the state by Article 2 (commencing with Section 11180), Chapter 2, Part I, Division 3, Title 2 of the Government Code.

"Any hearing or investigation by the board may be conducted by any member upon authorization of the board, and he shall have the powers granted to the board by this section, but *any final action of the board shall be taken by a majority of all the members of the board*, at a meeting duly called and held.

"All hearings by the board, or by any member thereof shall be open and public."

The difficulty is with the language I have italicized. The trial court termed section 183 "ambiguous."[2] If section 181 is considered with section 183, neither the majority nor I dispute that a thorny ambiguity is indeed presented.

---

[2] The trial court was clearly troubled on the point. It initially decided that the Board's action was invalid, but was persuaded to reverse this conclusion at oral argument on the tentative ruling. The court reexamined the issue on the Board's defective motion for reconsideration, acknowledging "there are extremely awkward results on both sides of this." The court remained uneasy to the end, stating in its "Order Denying Petition For Writ": "Section 183 is ambiguous, and my tentative found much merit in [the Association's] position. But on reflection it seems that I need more than some ambiguity

2

Does "a majority of all the members of the board" mean just that, namely, that every final action must have the recorded support of at least three members of the Board? Or, is the statutory language satisfied by a majority of a simple quorum of the Board's entire statutorily-authorized membership? Certainty does not come from examining the statutory language alone and at first glance the majority's answer would not be an unnatural interpretation—that is, if there is a quorum of a governing body, then a majority of that quorum is empowered to transact business and make decisions for the entity. This is the standard common law conclusion, not only in California (*People v. Harrington* (1883) 63 Cal. 257, 259; *County of Sonoma v. Superior Court* (2009) 173 Cal.App.4th 322, 346, fn. 11; *Martin v. Ballenger* (1938) 25 Cal.App.2d 435, 437), but nationwide. (*FTC v. Flotill Products, Inc.* (1967) 389 U.S. 179, 183; 4 McQuillin, The Law of Municipal Corporations (3d ed. 2011) § 13:34, pp. 1182-1183, § 13:37, pp. 1191-1192; 2 Fletcher Cyclopedia of Corporations (2014 rev. ed.) § 425, p. 286.)

This majority-of-a-quorum rule is codified and made applicable to the Board by the final sentence of section 181, which (also in its entirety) provides: "The board shall maintain its headquarters in Sacramento and may establish branch offices in such parts of the state as the board deems necessary. The board shall hold hearings at such times and at such places as shall be determined by it. The Governor shall designate the time and place for the first meeting of the board. Three members of the board shall constitute a quorum for the purpose of transacting any business of the board."

But there is an exception to the general common law rule. "If the law governing the body provides that certain acts may be done only by a majority of the members . . . , it is apparent that the acts specified may not be done legally by a bare majority of a quorum, or of members present. An affirmative majority . . . is required. . . . In the

if I am to determine that the Legislature desired to trump settled procedures, especially as the Board's reading [of § 183] is plausible." It is only fair to note that the trial court was making its decision pretty much on the language of sections 181 and 183 alone, whereas this court has had the time and luxury of consulting an array of materials pertaining to the legislative histories of the two statutes.

absence of the required majority, the measure fails passage." (4 McQuillin, The Law of Municipal Corporations, *supra*, § 13:40, pp. 1199-1200 and authorities cited, fns. omitted; see Annot., What Constitutes Requisite Majority of Members of Municipal Council Voting on Issue (1955) 43 A.L.R.2d 698, §§ 2-5, pp. 703-709; see also *Streep v. Sample* (Fla. 1956) 84 So.2d 586, 588; *City of Haven v. Gregg* (Kan. 1988) 766 P.2d 143, 147; *Blood v. Beal* (Me. 1905) 60 A. 427, 428-429; *Scheipe v. Orlando* (Pa. 1999) 739 A.2d 475, 477-478; *State ex rel. Doyle v. Torrence* (Tenn. 1958) 310 S.W.2d 425, 428.)

California has recognized this exception since the first years of statehood. (E.g., *City of San Francisco v. Hazen* (1855) 5 Cal. 169, 171-172; *Grogan v. San Francisco* (1861) 18 Cal. 590, 607-608; *Satterlee v. San Francisco* (1863) 23 Cal. 314, 318; *Fisher v. Board of Police Commissioners* (1965) 236 Cal.App.2d 298, 301; *Price v. Tennant Community Services Dist.* (1987) 194 Cal.App.3d 491, 495-496.) A 1992 opinion by the Attorney General states the general principle and the exception, with a notable economy of words: "In the absence of express contrary indication, a simple majority of a collective body constitutes a quorum, and a majority of a quorum is empowered to act for the body. [Citations.] [¶] Such express contrary indication has been found in those statutes which refer specifically to the members of a collective body as distinguished from the body itself. [Citations.]" (75 Ops.Cal.Atty.Gen. 47, 49 (1992), fns. omitted.) Examples of this majoritarian principle can be found at all levels of government.[3] And it is surely not without relevance to the present context that this

---

[3] The majoritarian exception governs the Legislature (Cal. Const., art. IV, § 8, subd. (b) ["No bill may be passed unless, by rollcall vote . . . , a majority of the membership of each house concurs"]; 65 Ops.Cal.Atty.Gen. 512, 515 (1982) ["majority" requirement refers to "all members elected to each of the two houses of the Legislature"]; Cal. Const., art., 13, § 28, subd. (i) ["The Legislature, a majority of all the members elected to each of the two houses voting in favor thereof, may by law change the rate or rates of taxes herein imposed upon insurers."]). It also governs boards of supervisors in general law counties (Gov. Code, § 25005 ["No act of the board shall be valid or binding unless a majority of all the members concur therein"]; *Dry Creek Valley Assn., Inc. v. Board of Supervisors* (1977) 67 Cal.App.3d 839, 842-845 ["This statute makes clear that

principle also governs a myriad of local agencies dealing with water, particularly concerning decisions with significant financial consequences.**4**

while a majority of the board will constitute a quorum for the transaction of business, no act of the board is valid unless a majority of the board, and *not a majority of those present and constituting a quorum*, shall concur," italics added]; 58 Ops.Cal.Atty.Gen. 706 (1975) ["Government Code section 25005 establishes an express exception to the common law rule that the vote of a majority of a quorum is sufficient"]; *County of Sonoma v. Superior Court, supra,* 173 Cal.App.4th 322, 346, fn. 11 [same]) and charter cities (Gov. Code, § 43120 ["The legislative body of any city operating under a charter . . . may adopt an ordinance by a majority of all its members, changing the fiscal year of the city"]); and the Judicial Council (Gov. Code, § 68508 ["No act of the Judicial Council shall be valid unless concurred in by a majority of its members"]; Cal. Rules of Court, Appen. G, Parliamentary Procedures for the Judicial Council of California, § IV ["To take any substantive action, a majority of all voting members of the Judicial Council must vote in favor of the action. (See Gov. Code, § 68508.) Because there are 21 voting members on the council, . . . a vote on a substantive motion . . . requires 11 affirmative votes to pass"]).

**4** E.g., §§ 30525 ["No ordinance, resolution, or motion shall be passed or become effective without the affirmative votes of at least a majority of the members of the [county water district] board"], 81636 ["the affirmative vote of a majority of all voting members of the [San Francisco Bay Area Regional Water System Financing Authority] board is necessary and sufficient to carry any motion, resolution, or ordinance"]; Health & Saf. Code, §§ 4730.65, subd. (c) ["No action shall be taken [by the Orange County Consolidated Sanitation District] unless a majority of all authorized members of the board of directors is in attendance"], 4795 [county sanitation district may authorize issuance of bonds "by resolution passed by a vote of a majority of all its members"]; Wat. Code Appen. § 51-7 , pp. 59-60 ["no act of the [Santa Barbara County Water Agency's board of directors] shall be valid or binding unless a majority of all the members concur therein"]; Wat. Code Appen. § 53-4, pp. 137-138 ["no act of the [Sonoma County Flood Control and Water Conservation District's board of directors] shall be valid or binding unless a majority of all the members concur therein"]; Wat. Code Appen. § 93-33, pp. 104 ["no act of the [Yuba-Bear Basin Authority Act's board of directors] shall be valid or binding unless a majority of all members concur therein"]; Wat. Code Appen. § 128-401, p. 809 ["Four affirmative votes [of the seven members of the Mono County Tri-Valley Groundwater Management District's board of directors] shall be required to take an action"]; Wat. Code Appen. § 136-108, p. 1030 ["the decision of a majority of all the members of the board [of directors of the Antelope Valley Storm Water Conservation and Flood Control District] shall be necessary to take any action"]; cf. Wat. Code Appen . § 132-505, p. 894 ["no act of the board [of directors of the Odessa Water

The problem before us is not whether section 183 is such an exception to the majority-of-a-quorum principle of section 181, because the majority concedes that it is. The question that divides us is the extent of the exception. Like the trial court, we found the point sufficiently troubling that we took a second look. Thus, we vacated submission of the cause following oral argument, and directed the parties to file supplemental briefing "discussing the application and interplay, if any, between Water Code sections 181 and 183."

Armed with that supplemental briefing, and independent research at this end, I submit that the evolution and development of the two statutes is more nuanced than might initially appear from the majority opinion.

### The Legislative Histories of Section 181 and 183

I agree with the majority that section 181 and 183 should be construed together. Not only are both statutes in the same article of the Water Code establishing the Board and procedures for its operation (§§ 174-189), but they are the only statutes dealing with voting by the Board. In addition, as will be seen, in large measure, sections 181 and 183 share a joint legislative heritage. Most importantly, it is only with a joint consideration that the magnitude of the ambiguity appears. Reading them together is not only natural but proper. (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 778; *Eel River Disposal and Resource Recovery, Inc. v. Humboldt* (2013) 221 Cal.App.4th 209, 231-232; *Main San Gabriel Basin Watermaster v. State Water Resources Control Bd.* (1993) 12 Cal.App.4th 1371, 1379-1380 & fn. 5.)

Section 181 was adopted in 1956. Then numbered section 191, it provided: "The board shall maintain its headquarters at Sacramento and shall hold meetings at such times and at such places as shall be determined by it. The Governor shall designate the time and place for the first meeting of the board. All meetings of the board shall be open and public." (Stats. 1956, 1st Ex. Sess., ch. 52, § 7.) The following year it was renumbered

District] shall be valid or binding unless a majority *of those members present and voting* concur in the act" (italics added)].

6

without change as section 181 (Stats. 1957, ch. 1932, § 30), and then amended with the addition of this as the final sentence: "Two members of the board shall constitute a quorum for the purpose of transacting any business of the board." (Stats. 1957, ch. 947, § 4.) In 1967, when the Board's membership was expanded from three to five, the final sentence was amended to reflect this increase (Stats. 1967, ch. 284, § 2.4 [amending § 175 to increase Board], § 5 ["Three members of the board shall constitute a quorum"]), which is how it has remained to this day.

Section 183 was also adopted in 1956. Then numbered section 193, it provided: "The board may hold hearings and conduct any investigations in any part of the State necessary to carry out the powers vested in it, and for such purposes as the powers conferred upon heads of departments of the State by Article 2 (commencing at Section 11180), Chapter 2, Part 1, Division 3, Title 2 of the Government Code. [¶] Any hearing or investigation by the board may be conducted by any member of the board upon authorization of the board, and he shall have the powers granted to the board by this section, but any final action of the board shall be taken by the board as a whole. [¶] All hearings held by the board or by any member thereof shall be open and public." (Stats. 1956, 1st Ex. Sess., ch. 52, § 7.)

In 1957, section 193 was renumbered without change as section 183. (Stats. 1957, ch. 1932, § 30.) That same year the "any final action of the board shall be taken by the board as a whole" language was amended to "any final action of the board shall be taken by a majority of members of the board at a meeting duly called and held." (Stats. 1957, ch. 1824, § 2.) In 1967, the Legislature added an exception to the hearings or investigations that could be conducted by a single member. (Stats. 1967, ch. 284, § 5.2 ["Any hearing or investigation by the board, except pursuant to Division 7, . . . may be conducted by any member of the board upon authorization of the board"].)

In 1969, the Legislature was considering Assembly Bills 412 and 413. Assembly Bill 413—which was designated the California Water Quality Improvement Act of 1969, and which included the Porter-Cologne Water Quality Control Act—was sponsored by the Board, which described it as "incorporat[ing] the recommendations of the State Water

Resources Control Board Study Panel as adopted by the Board." (State Wat. Resources Control Bd., Enrolled Bill Rep. of Assem. Bill No 413 (1969-1970 Reg. Sess.) July 8, 1969, p. 1.) The measure was signed by Governor Reagan on July 14, 1969. (Stats. 1969, ch. 482, p. 1046.) Assembly Bill 412 was signed five weeks later, on August 22. Both bills were introduced by Carley Porter, chairman of the Assembly Committee on Water. (Assembly Final History, Assem. Bills Nos. 412, 413 (1969-1970 Reg. Sess.), pp. 159-160.)

With respect to section 183, Assembly Bill 413 continued the "any final action of the board shall be taken by a majority of the members of the board at a meeting duly called and held" language. (Stats. 1969, ch. 482, § 2.) Assembly Bill 412 added the word "all," so that the statute in its current form reads: "any final action of the board shall be taken by a majority of all the members of the board at a meeting duly called and held" language. (Stats. 1969, ch. 800, § 1.)

On August 4, 1969, Assembly Bill 413 had already been signed by the Governor, while Assembly Bill 412 was still pending in the Assembly, after having been amended by the Senate as recommended by the Senate Committee on Water Resources and sent to the Assembly two days earlier. (Assem. Final History, Assem. Bill No. 412 (1969-1970 Reg. Sess.), p. 159; 3 Sen. Journal (1969-1970 Reg. Sess.) pp. 5093-5094.) On August 4, Senator Gordon Cologne, the chairman of that committee and the floor manager for both bills in the Senate, successfully moved that a letter be printed in the Senate Journal. For obvious reasons, Senator Cologne's letter is too significant to risk paraphrase.

"Senate Committee on Water Resources<br>"Sacramento, July 29, 1969

"*Hon. Ed Reinecke, President of the Senate*

"Dear Mr. President: The Committee on Water Resources, having considered Assembly Bill 412 and having reported it out with a favorable recommendation, submits this report concerning Assembly Bill 412.

8

"This report contains comments to reflect the actions and intent of the Committee in approving AB 412 and, additionally, the intent of the author's amendments [to AB 412] adopted by the Senate on July 21, 1969.[5]

"It is intended that these comments be utilized to assist in the determination of legislative intent.

"Respectfully submitted,

"GORDON COLOGNE, Chairman

"REPORT OF SENATE COMMITTEE ON WATER RESOURCES
"ON ASSEMBLY BILL 412

"In order to indicate more fully its intent on Assembly Bill No. 412, as amended July 10, 1969, the Senate Committee on Water Resources makes the following report:
"The following comments to various sections of Assembly Bill 412 supplement the comments of the Senate Committee on Water Resources made with respect to the related subject matter in Assembly Bill No. 413 (Senate Journal, July 2, 1969,

---

[5] Being author of the amendments was the third of Senator Cologne's connections to the version of section 183 we are considering.

Parenthetically, it should be noted that the apparent anomaly of a committee report explaining a bill that had already been passed might seem a textbook example of *post hoc ergo propter hoc*. However, in the days when California legislative histories were far from the robust specimens of today, the practice of inserting committee reports into a legislative journal was not unusual. The most pertinent example was that Assembly Chairman Porter had a "Report of Assembly Committee on Water on Assembly Bill No. 413" printed in the Assembly Journal after that bill had been passed by the Assembly. (See 2 Assem. Journal (1969-1970 Reg. Sess.) p. 2677; see also *People v. Massie* (1998) 19 Cal.4th 550, 567 ["on May 28, 1935 . . . the Special Committee Report was recorded in the Senate Journal"]; *Garcia v. Industrial Accident Com.* (1953) 41 Cal.2d 689, 692 ["in the language of the report of the Senate Interim Committee on Unemployment Insurance, Senate Journal, May 7, 1945, p. 126"]; *Ne Casek v. City of Los Angeles* (1965) 233 Cal.App.2d 131, 139 ["The comment of the Legislative Committee inserted in the Senate Journal of April 24, 1963"], 141 ["The Legislative Committee Comment, recorded in the Assembly Journal of June 15, 1963)"].)

In any event, the anomaly is only apparent because the report that Senator Cologne had put into the Senate Journal had obviously been seen, at a minimum, by the Senate committee which generated it, prior to Senate passage of Assembly Bill 412. The report, as reproduced in the Senate Journal, is thus no different in dissemination and impact than the committee reports that are now far more common.

pp. 3933-3934[6]), and also reflect the intent of the Senate Committee on Water Resources in approving Assembly Bill No. 412.

"WATER CODE PROVISIONS
"Section 183

"*Comment*. The present law is ambiguous as to whether final action by the state board always requires a majority consisting of three members of the five-man state board, or whether the majority required is only that of the 'members of the board (present) at a meeting duly called and held.'[7] In the latter case three members could constitute a quorum, and the vote of two members would constitute a majority of the members at the meeting. An amendment has been made to this section to remove the ambiguity by requiring that final board action shall always require the concurrence of a majority of all the members of the board, not merely a majority of a quorum. . . ." (3 Sen. Journal. (1969-1970 Reg. Sess.) p. 5154.)

The following day, August 5, the Assembly concurred in the Senate amendments, and four days later the enrolled bill was sent to Governor Reagan for his signature. (Assem. Final History, Assem. Bill No. 412 (1969-1970 Reg. Sess.), p. 159; 3 Assem. Journal (1969-1970 Reg. Sess.) pp. 7496-7502; 3 Sen. Journal (1969-1970 Reg. Sess.) pp. 5093-5094.)

**My Conclusion**

Like the trial court, I am willing to concede that the unadorned language of section 183 is "ambiguous" in the sense that it alone does not provide a conclusive answer. (See fn. 2, *ante*.) The majority does not expressly concede that section 183 is ambiguous, although it does cite the governing canon of statutory construction justifying

---

[6] The cited pages in the Senate employ the same letter format to set out the "Report of the Senate Committee on Water Resources on Assembly Bill 413." There are additional "comments" to various provisions, but no mention of either section 181 or section 183. (2 Sen. Journal (1969-1970 Reg. Sess.) pp. 3933-3934.)

[7] The source of the ambiguity is not identified, but it may trace to when section 183 was amended in 1957, and the Legislative Counsel described the measure as amending section 183 "to require final action of State Water Rights Board [the predecessor to the State Water Quality Resources Board] to be taken by a majority of members at [a] meeting duly called and held, rather than by [the] board as a whole." (Legis. Counsel's Dig., Sen. Bill No 2199 (1957 Reg. Sess.) Summary Digest, p. 128.)

10

resort to legislative history.[8]  The majority partially parses the middle sentence of section 183, focusing on the words "but" and "any" (maj. opn., pp. 8-9), but completely ignoring the word "all."  The majority concludes:  "the express language of section 183 indicates that this statute applies *only* to those situations where the Board has delegated authority to one member to conduct a hearing or meeting.  . . . [B]ecause a quorum participated in the hearing pertinent to this case, section 183 does not apply."  (Maj. opn., pp. 9-10.)  As for

---

[8]  I admit to being puzzled by the majority's invocation of the principle that statutes in derogation of the common law are to be strictly construed.  (See maj. opn., pp. 7, 13.)  California repudiated this rule when it undertook the systematic codification of its statutes.  (Civ. Code, § 4 ["The rule of the common law, that statutes in derogation thereof are to be strictly construed, has no application to this code.  The code establishes the law of this state respecting the subjects to which it relates, and its provisions are to be liberally construed with a view to effect its objects and promote justice."]; Code Civ. Proc., § 4 [same]; Evid. Code, § 2 [same]; Pen. Code, § 4 ["The rule of the common law, that penal statutes in derogation thereof are to be strictly construed, has no application to this Code."].)  My impression is that our Supreme Court has been generally moving in this direction for some time, particularly as the scope and frequency of legislative output has mushroomed.  (See, e.g., *Estate of Parrott* (1926) 199 Cal. 107, 112-113 ["[T]here is no room in this case for the play of the strict construction rule. . . .  The maxims of jurisprudence that 'interpretation must be reasonable' (sec. 3542, Civ. Code) and that a statute is to be 'liberally construed with a view to effect its object and to promote justice' (sec. 4, Civ. Code) are generally applicable and must be given effect. . . .  No construction should be given a statute which would make its application impracticable, unfair, or unreasonable."]; *Raynor v. City of Arcata* (1938) 11 Cal.2d 113, 121 ["the rule that statutes . . . in derogation of the common law are to be strictly construed . . . does not confer upon courts the power to nullify legislation where the statute itself evinces a clear intention on the part of the lawmakers to depart from the common law rule"]; *Baugh v. Rogers* (1944) 24 Cal.2d 200, 211 ["the asserted rule of strict construction does not authorize us to thwart, by narrow and strained interpretation, the palpable intent of the Legislature"]; *Li v. Yellow Cab Co.* (1975) 13 Cal.3d 804, 815 [Civ. Code, § 4 means " 'If a provision of the code is plain and unambiguous, it is the duty of the court to enforce it as it is written.' "]; *Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 46 ["The policy of strictly construing statutes in derogation of the common law does not require a literal interpretation conflicting with the obvious legislative intent."]; *Franchise Tax Bd. v. Superior Court* (2011) 51 Cal.4th 1006, 1016 ["the statute in derogation of the common law rule was 'befitting to this more enlightened age.' "].)

Similarly mystifying is the majority's citation of rule of deference to a longstanding administrative interpretation of a statute (maj. opn., p. 11), when the Board has drawn our attention to no such interpretation.

11

the 1969 legislative history, the majority misidentifies the crucial item as "a letter . . . from Senator Gordon Cologne," and then dismisses it as merely a "comment" that "simply clarified that section 183 requires a majority vote with respect to final action on any matter heard or investigated by a single member of the Board." There is no mention of section 181 and thus no indication of intent to "do away with the general rule set forth in section 181." (Maj. opn., pp. 12-13.)

The majority appears willing to read the second sentence of section 183 as stating an exception to the majority-of-a-quorum rule of section 181. So, in instances where if one member of the Board conducts a "hearing or investigation . . . upon authorization of the board," the majority seems to concede that the language "any final action of the board shall be taken by a majority of all the members of the board" means that decision must have the votes of at least three members of the Board. But every other "final action of the board" need only command two votes of a quorum. With this construction I cannot agree.

I am perfectly willing to admit that certainly section 181 and, to a lesser extent, section 183, each began their respective existences in 1956 addressing more than one subject. Amendments were thereafter made to both in 1957 and 1967. In a perfect world, the Legislature, intending to make the task of the judiciary easier, might have made more explicit what is the interplay between sections 181 and 183. In fact, I believe the Legislature did just that, albeit hardly in a linear or an unambiguous fashion.

What the majority dismisses as merely "a letter . . . from Senator Gordon Cologne" is not what we are considering—and not what is at issue. The actual document from the senator is simply a cover letter for the Report of the Senate Committee on Water Resources. It was that report, not the senator's transmission letter, which sets out the intent of the amending author and the Committee in amending section 183. The report conveyed not just the view of Chairman Cologne, but the view of the entire Committee. It was the Committee's report that was, with Senator Cologne's cover letter, ordered printed in the Senate Journal.

12

Certainly, Senator Cologne did state in his cover letter that "It is intended that these comments be utilized to assist in the determination of legislative intent," but this hardly makes it a purely personal opinion of a single individual.  The senator was acting in his capacity as chairman of the committee whose report he was transmitting to the full Senate, the report he was securing permission from the entire Senate to be printed in its official journal.  True, Senator Cologne's letter recites that the report "contains comments to reflect the actions and intent of the Committee . . . and additionally the intent of the author's [ i.e., Senator Cologne's] amendments."  But the actual report *of the Committee* also makes the same statement:  that the purpose of that report *by the Committee* is "to indicate more fully its [*the Committee's*] intent on Assembly Bill No. 412.  So, it is the "comment" *of the Committee*, in the *Committee's* report, explaining what it, *the Committee*, meant by its proposed amendment of section 183, that is before this court.

The Senate Journal is a source accepted by this court and others for ascertaining legislative intent.  (*Garcia v. Industrial Accident Com.*, *supra*, 41 Cal.2d 689, 692; *City and County of San Francisco v. Evankovich* (1977) 69 Cal.App.3d 41, 52; *Belli v. Roberts Bros. Furs* (1966) 240 Cal.App.2d 284, 287.)  Its status is elevated still higher when it expresses a legislative committee report, which is the preeminent coin of the realm in determining legislative intent.  (E.g., *People v. Cruz* (1996) 13 Cal.4th 764, 774-775, fn. 5; accord, *Benson v. Workers' Compensation Appeals Bd*. (2009) 170 Cal.App.4th 1535, 1554, fn. 16; see fn. 5, *ante*.)  Thus, we have granted the Association's request to take judicial notice of the letter and the report.  (*In re J.W.* (2002) 29 Cal.4th 200, 211; *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc*. (2005) 133 Cal.App.4th 26, 32.)

Unlike the majority, I cannot disregard the "comment" of the Senate Committee on Water Resources concerning the meaning of the language of section 183 we are here considering.  Unlike the majority, I cannot ignore the Committee's comment in the belief that it has no bearing on this issue before us in that it does not address the interplay between sections 181 and 183, nor suggest that the amendment to section 183 overrules

or in any way modifies section 181. On the contrary, I think this was exactly what the Committee did address.

It is true that the comment does not make express reference to section 181. However, I submit that when the Committee spoke of an instance where "three members could constitute a quorum, and the vote of two members would constitute a majority," the Committee obviously had section 181 in mind. In all the statutes governing the Board's operations, the word "quorum" appears only in section 181, so no other statute qualifies. By putting its comment under the heading "Water Code . . . Section 183," I submit that the Committee was indeed addressing the interplay between sections 181 and 183.

And how did the Committee address that interplay? Let us examine each of the three sentences in the Committee's comment.

(1) "The present law is ambiguous as to whether final action by the state board always requires a majority consisting of three members of the five-man state board, or whether the majority required is only that of the 'members of the board (present) at a meeting duly called and held." This litigation testifies to the continuing existence of this ambiguity.

(2) "In the latter case three members could constitute a quorum, and the vote of two members would constitute a majority of the members at the meeting." This is an obvious reference to section 181.

(3) "An amendment has been made to this section [i.e., section 183] to remove the ambiguity by requiring that final board action shall always require the concurrence of a majority of all the members of the board, not merely a majority of a quorum." By intending "to remove the ambiguity," the Committee was certainly addressing the interplay between sections 181 and 183 that was the source of that ambiguity. The Committee's solution was the 1969 amendment to section 183, to specify "that final board action shall always require the concurrence of a majority of all the members of the board, not merely a majority of a quorum." The last seven words again demonstrate that the Committee had section 181 in mind.

14

The Committee's report demands attention. Unlike the majority, I believe the Committee's comment is not only relevant, and not only germane, but that it is virtually decisive. It directly addressed the meaning of the language of section 183 amended in 1969 and now being contested. It constitutes the last and most recent expression of the legislative purpose behind that language. It shows not only that the Legislature was aware of a lurking ambiguity in section 183 as it then read concerning the majority-of-a-quorum principle of section 181, but it also establishes beyond question that the Legislature unanimously meant to displace that principle by inserting the word "all" so that section 183 would state that "any final action of the board shall be taken by a majority of all the members of the board." Where "final action " was concerned, section 183 was meant to trump section 181.

Unlike the majority, I cannot confine section 183's "majority of all the members of the board" language to instances where there has been a hearing or investigation conducted by one member of the Board. Viewed in splendid isolation, such a reading might not be illogical as a matter of mere words. However, such a reading must be rejected because it makes almost no sense in the real world—and was not what the Legislature intended. (*Burris v. Superior Court* (2005) 34 Cal.4th 1012, 1017-1018; *People v. Nelson* (2011) 200 Cal.App.4th 1083, 1098; *People v. Wilen* (2008) 165 Cal.App.4th 270, 285.) The present case will illustrate. Suppose that a sole member of the Board had conducted the hearings on modifying the waste discharge fees. According to the majority, formal adoption of the new fees would require three votes, that is, an absolute majority of the full Board. But if the hearings had been held by the full Board, it would—as it did here—take only two affirmative votes of the bare quorum of three Board members present. Where is the logic in that?

The majority correctly notes that the Board's members are statutorily intended to broaden its outlook. Section 175 directs that four of the Board's five members shall "represent diverse specialties." (Maj. opn., p. 9.) But the utility of this diversity seems to be nullified with the majority-of-a-quorum rule. Why would the Legislature establish a procedure system that does not take the fullest advantage of all that talent?

15

The difficulty comes upon consideration of the 1969 amendment directing that "any final action of the board shall be taken by a majority of all the members of the board." The disturbing words are "any final action by the board," conjoined with the Senate Committee's comment that the amendment was intended to "[require] that final board action shall *always* require the concurrence of a majority of all the members of the board, *not merely a majority of a quorum*." (Italics added.)

The meaning of section 183 is not to be gleaned solely from its language alone. The statutory scope and purpose is to be discerned from an appreciation of the entirety of the statutory scheme, of which section 183 is but a single part. We have noted: " ' "[T]o seek the meaning of a statute is not simply to look up dictionary definitions and then stitch together the results. Rather, it is to discern the sense of the statute and therefore its words, *in the legal and broader culture . . . .*" ' " (*People v. Wilen, supra,* 165 Cal.App.4th 270, 285.) "The rules of grammar . . . are but tools, 'guides to help courts determine likely legislative intent. [Citations.] And that intent is critical. Those who write statutes seek to solve human problems. Fidelity to their aims requires us to approach an interpretive problem not as if it were a purely logical game, like a Rubik's Cube, but as an effort to divine the human intent that underlies the statute.' " (*Burris v. Superior Court, supra,* 34 Cal.4th 1012, 1017-1018.)

Because of the ambiguity from the language of section 183, by itself and when read in conjunction with section 181, it is appropriate to consult the sparse legislative history for assistance, particularly "extrinsic evidence bearing upon the meaning of [the] ambiguous phrase." (*Eel River Disposal and Resource Recovery, Inc. v. Humboldt, supra,* 221 Cal.App.4th 209, 224.) The search is for the construction that most closely effectuates the Legislature's intended purpose and sound public policy. (*Catlin v. Superior Court* (2011) 51 Cal.4th 300, 304; *Mays v. City of Los Angeles* (2008) 43 Cal.4th 313, 321.) This court has repeatedly made it clear that fidelity to plain language is not followed to the point of sanctioning absurdity. (*People v. Nelson, supra,* 200 Cal.App.4th 1083, 1097-1098; *Brown v. Valverde* (2010) 183 Cal.App.4th 1531,

16

1546; *MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082-1083.)

It is true that section 183 does not use the word "vote" (for that matter, neither does section 181), or expressly tie it to the existence of a "final decision." The omissions are not consequential, because the nexus is implicit in the concept of "a majority of all the members of the board " taking "final action." How else is "final action" to be "taken" if not by voting? This is apparent from the Board's own procedures.[9] Representing the Board, the Attorney General appears to equate the "opportunity to participate" with actual voting.[10] I am not sure whether the majority agrees with this approach

---

[9] With respect to the uncontested items calendar at Board meetings, the Board's rules of practice and procedure (Cal. Code Regs., tit. 23, §§ 647-647.5) direct: "After an opportunity for requests to remove any matters from the uncontested items calendar has been given, a vote shall be taken on the uncontested items calendar. Upon a vote to approve the uncontested items calendar, each matter on the uncontested items calendar shall be approved and shall have the same force and effect as it would have if approved as a separate agenda item." (*Id.*, § 647.2(f)(4).) The clear implication is that separate agenda items are approved by a vote.

[10] In its original and its supplemental briefs, the Board has treated a 1956 opinion by Attorney General Edmund G. Brown as imbuing the word "participate" with a special meaning. The predecessor of the Board queried the Attorney General: "Does section 193 of the Water Code, providing that any final action of the State Water Rights Board 'shall be taken by the board as a whole' require that all three members participate in each final action, or may final action be taken by two of the three members?" The Attorney General's conclusion was that "the action of two of the three members may constitute the final action of the board." The underlying reasoning was as follows:

"By section 12 of the Civil Code and section 15 of the Code of Civil Procedure, the general rule is established that 'Words giving a joint authority to three or more public officers or other persons are construed as giving such authority to a majority of them, unless it is otherwise expressed in the Act giving the authority.' Can it be said that 'it is otherwise expressed' and the general rule made inapplicable by virtue of the phrase 'shall be taken by the board as a whole'? We think not. The phrase, when viewed in its context, simply constitutes a *proviso* to the clause preceding it and authorizing the board to delegate all its powers to any *one* of its members. The phrase constitutes a command only that the board not delegate to *one* member its final decision making power. Consequently, the words 'as a whole' may not properly be interpreted as specifically requiring unanimous decisions—i.e., that all three members in each case actually participate in the taking of any 'final action'. Rather, they contemplate merely that all

17

(see maj. opn., p. 10 ["[B]ecause a quorum participated in the hearing pertinent to this case, section 183 does not apply"]), but I do not. Mere presence or talking is certainly not the same as voting. (See *City of San Francisco v. Hazen, supra,* 5 Cal. 169, 172 [rejecting the argument that statutory language requiring acts be " 'passed by a majority' . . . do not necessarily imply a consent or acquiescence, but only a presence or participation. . . ."].) And voting is no arid formality.

The Board has a vast and significant jurisdiction. Pursuant to Porter-Cologne, it is vested with the authority to "formulate and adopt state policy for water quality control." (§ 13140.) It is charged with "the orderly and efficient administration of the . . . adjudicatory and regulatory functions of the state in the field of water resources," (§ 174; see § 275 [Board to prevent waste, unreasonable use, and unreasonable diversion "of water in this state"]) namely, " 'the water rights and the water pollution and water quality functions of state government . . . and availability of unappropriated water.' " (*State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 696.) The Board promulgates regulations (§ 1058), adopts schedules of fees (§§ 1525, subd. (a), 13260, subd. (f)(1)), imposes cease and desist orders (§ 13301), issues permits (see Attwater & Markle, *Overview of California Water Rights and Water Quality Law* (1988) 19 Pac. L.J. 957, 997), and levies civil penalties (§ 13308). Such decisions would seem to require what section 183 terms a "final action."

In exercising the power delegated by the Legislature to adopt the schedule of fees now being challenged by the Association, the Board was exercising quasi-legislative power. (See *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 10; *California Building Industry Assn. v. San Joaquin Valley Air Pollution Control Dist.* (2009) 178 Cal.App.4th 120, 135-137; *City Council v. Superior Court* (1960)

---

members of the board, in each case, shall have full opportunity to participate in any final decision (*City of Nevada v. Slemmons* (Iowa 1953) 59 N.W.2d 793, 795; *Duessel v. Proch* (Conn. 1905), 62 Atl. 152, 154). Accordingly, we are of the opinion that final actions of the State Water Rights Board may be taken by a majority of its members." (28 Ops.Cal.Atty.Gen., 259, 260 (1956).)

18

179 Cal.App.2d 389, 393.)  The exercise of that power is where the needs of legitimacy and accountability are most acute.  "There is a strong public policy 'that members of public legislative bodies take a position, and vote on issues brought before them . . . .' " (*Kunec v. Brea Redevelopment Agency* (1997) 55 Cal.App.4th 511, 520, quoting *Dry Creek Valley Assn., Inc. v. Board of Supervisors*, *supra*, 67 Cal.App.3d 839, 844; accord, *City of King City v. Community Bank of Central California* (2005) 131 Cal.App.4th 913, 940-941, fn. 18; see 4 McQuillin, The Law of Municipal Corporations, *supra*, § 13:64, p. 1253 ["Statutory requirements for the passage of ordinances and resolutions . . . are . . .for the protection of the public"].)  "The common law and statutory rules requiring legislative bodies act only by majority rule reflect 'the deeply embedded principle of majority rule in a democratic society . . . .' " and are essential " 'in our system for giving policies legal effect and legitimacy.' "  (*County of Sonoma v. Superior Court*, *supra*, 173 Cal.App.4th 322, 346, fn. omitted.)

The Board's reading of section 183 as requiring, or permitting, only nonvoting "participation" (see fn.10 and accompanying text, *ante*) is entirely artificial.  (See *City of San Francisco v. Hazen, supra,* 5 Cal. 169, 172.)  If the middle paragraph of section 183, with its "any final action of the board shall be taken by a majority of all the members of the board" language, is confined to the Board's consideration of a hearing or investigation conducted by a single member, the connection between voting and a "final action" by the Board would be severed in all other instances where the Board was considering final action on a matter.  Such a restriction could have the consequence of greatly reducing the number of situations where the Board's members have to announce their votes at a meeting that is both open to the public (§ 183) and recorded for public review.  (Cal. Code Regs., tit. 23, § 647.4.)

This case provides a dramatic illustration of why such a result should not be countenanced.  Two members of the Board enacted what the majority acknowledges might, in different circumstances, have been proved to be an invalid tax of many millions of dollars.  (Maj. opn., pp. 16-22.)  It would be hard to imagine an issue where the demand for public accountability is greater.  Enacting a tax with a minority vote strikes

19

me as an absurd and invidious result, particularly in this age of Proposition 26, as it would give the Board a power denied to local water agencies. And it is directly contrary to what the Legislature intended with the 1969 amendment of section 183—"that *final board action shall always require the concurrence of a majority of all the members of the board.*" (Italics added.)

Acceding to the Board's reading of section 183 would also oblige us to disregard "a cardinal rule of statutory construction that the language of a statute should be construed to effect, rather than defeat, its evident object and purpose." (*East Bay Garbage Co. v. Washington Township Sanitation Co.* (1959) 52 Cal.2d 708, 713.) Finally, " '[t]hat construction of a statute . . . is favored which would defeat subterfuges, expediencies, or evasions employed to continue the mischief sought to be remedied , or to defeat compliance with its terms, or any attempt to accomplish by indirection what the statute forbids.' " (*Freedland v. Greco* (1955) 45 Cal.2d 462, 468.) Given what we now know about the 1969 Senate Water Resources Committee report of what was intended, I submit that section 183 has a far broader reach than the majority's conception. Conversely, insofar as a "final action of the board" is involved, I believe that the majority-of-a-quorum principle of section 181 should receive a far more modest scope.

Just what constitutes "any final action" by the Board is to be given a broad application. (See *California Highway Patrol v. Superior Court* (2008) 158 Cal.App.4th 726, 736 and authorities cited.) We are not at this time called upon to decide how a decision by the Board is to be categorized as a "final action," but I am confident this one does.[11] It easily includes the quasi-legislative adoption of a schedule of increased fees for the Storm Water Management Program, which section 183 requires to "be taken by a majority of all the members of the Board." That majority would be three. (See *County of*

---

[11] There is obviously some distinction between what constitutes "any business of the board" that section 181 authorizes the majority of a quorum to "transact" and the apparently weightier "final action of the board" which section 183 commands "shall be taken by a majority of all of the members of the board." Determining the contours of that distinction may be deferred to another day.

*Sonoma v. Superior Court, supra*, 173 Cal.App.4th 322, 347 ["Because 'three members must "concur" in order to act' . . . , the votes of . . . two members of a governing body simply cannot be construed as an act of the governing body itself"]; *Price v. Tennant Community Services Dist.*, *supra*, 194 Cal.App.3d 491, 495 ["a majority of the five member board of directors . . . is three"]; 66 Ops.Cal.Atty.Gen. 336, 337 (1983) ["Since a board has five members . . . , three members must 'concur' in order to act. . . . A vote of two to one thus would be insufficient to bind the board."].) The final action here had only two.

My vote is to reverse the judgment, and remand the cause to the trial court with directions to issue a writ of mandate directing the Board to set aside its purported approval of Resolution 2011-0042.[12] Because the majority votes otherwise, I respectfully dissent.

_____
Richman, J.

---

[12] In light of this conclusion, I express no opinion on the other issues addressed in the majority opinion.